## CITY MAGISTRATES' COURT—NEW YORK CITY,
### May 22, 1911.

## THE PEOPLE ex rel. EDUARDO ESPINOSA v. RAUL PEREZ.

**(1.) CRIMINAL LIBEL, SECTION 1340 PENAL LAW.**

Evidence reviewed, and defendant held thereon for the Grand Jury.

**(2.) SAME—QUALIFIED PRIVILEGE AS A DEFENSE TO A CHARGE THEREOF.**

Privilege does not permit a person to go beyond the limits of fair and honest criticism, which must be subservient to the public interest and good, and without evil or malice.

*Edward A. Alexander, Esq.,* for the People.

*Edwin R. Leavitt,* Esq., for the Defendant.

FRESCHI, City Magistrate:

The information filed with this Court, and upon which a summons was issued, charges the defendant, Raul Perez, with a criminal libel, defined by our penal laws (§ 1340) as " a malicious publication, by writing, printing, picture, effigy, sign or otherwise than by speech, which exposes any living person * * * to hatred, contempt, ridicule, or obloquy, or which causes, or tends to cause any person to be shunned or avoided, or which has a tendency to injure any person * * * in his business or occupation.

The basis of the complaint is a certain letter, People's Exhibit 1, in the Spanish language, composed, written and published on February 12th, 1911, in the City, County and State of New York, by the defendant, of and concerning the complainant, formerly a Consul-General of the Republic of Colum-

bia at the City of New York, a Secretary of the Legation in England and in France, and now a " Special agent " or commissioner," commissioned by his government through the late President of Colombia, General Reyes, to come to these United States, and to study the Police and Fire Departments of the City of New York. The portion of the alleged defamatory letter of which complaint is made reads, in part, as follows; taking, as I do, the defendant's translation of it:

" The other adviser of Consul-General Castillo does not lag behind the former. He is the illustrious and renowned Secret Police Agent, Mr. Eduardo de Espinosa Guzman, skillful artist in detecting the movements, gestures and attitudes of dissatisfied parties with any constituted and solvent regime. Mr. Espinosa was sent by the brainy General Reyes, of most pleasing and everlasting memory, to perfect himself in the detective art, here in Yankeeland; but since the time when his eminent Chieftain had some sort of mishaps, and retired to full enjoyment of his well-acquired wealth, setting aside the burdens of public weal, the faithful follower of the unparalleled man, Mr. Espinosa, has devoted his time to advise Consuls, and to act as smart agent for commercial companies of immense notoriety, of such notoriety that the Government here, being a grateful one, decides to provide for Mr. Espinosa's principals, the officers of said companies, cool places where they would undergo no damage through the action of the scorching solar rays, or that of the icy wintry blasts. All this at the expense of the government."

The authorship of this letter is admittetd by the defendant. And in respect of its publication, it has been proved that the defendant permitted said letter to be read by various persons in this City before it was mailed to and received by Sig. Rafaelo del Castillo, the acting Consul General of Columbia, in New York City.

The defendant testified that he made ten copies of the orig-

inal which was sent by him to the Minister Plenipotentiary of the Republic of Columbia, Francesco de P. Borda, at Washington, D. C., and that the two sets of five each "were mailed to different officials of the Colombian Government."

The writing of the said letter, defendant claims, was prompted by a sense of civic duty and patriotism and because, as the defendant testified, "I wanted the Colombian Consulate investigated, and the connection of Mr. Espinosa with the Consulate, and his acting in going around and selling stock, or being instrumental in selling stock of certain companies, would strengthen my case with the Colombian Government." His reason for wanting the Colombian Consulate investigated, as he says, was because he "considered that it is not properly handled." It is, indeed, a potent and significant circumstance that the defendant should make these declarations respecting the Consulate of his country in the face of the atttitude of the incumbent of that office, who, it seems, disputed a claim of $7500. for legal services alleged to have been rendered by one Mr. George B. Holbert in the transfer of the Bogotesian Railroad Company to the Municipality of Colombia, and for whom the said defendant rendered services as translator, and other "professional services in arranging the papers necessary for. the transfer; for all of which Holbert has promised to pay as soon as the Republic of Colombia pays his claim for professional services."

On cross-examination the defendant was asked this question: Q. "In this letter, the original of which is in evidence, People's Exhibit No. 1, you speak of General Espinosa as having devoted himself to be the very active agent of commercial companies of immense notoriety, of such notoriety that the government of this country had the gratitude to decide to put the principals of Mr. Espinosa the dignitaries of said companies in fresh places where the piercing rays of the sun or the frigid winter breezes might not cause them any damage; all

of this at the expense of the government. When you wrote this letter, to what companies of immense notoriety did you refer? A. " To the United Wireless." Q. " Was General Espinosa an agent of the United Wireless Company "? A. " I don't know whether he was agent, or whether he had been appointed. I never saw his credentials. I was saying that on information." Q. " What other companies of immense notoriety did you refer to when you wrote this letter?" A. " No other." Q. " You only had information that he was the agent of a single company; is that correct?" A. " Agent! I said I didn't know whether he was an agent or not." Q. " From whom did you obtain that information?" A. " From Mr. Borda." Q. " What did Mr. Borda say in reference to that subject?" A. " Mr. Borda said that he had bought stock in the company, and that Mr. Espinosa was instrumental in bringing him around and saying to him that this company was a very good one, and that he should take stock of in it; and had taken him to the place where they were selling it, and had shown him their apparatus, and had insisted on his buying it."

Defendant further testified that this was all the information he had on the subject of Espinosa being the " active agent of commercial companies of immense notoriety," and that he wrote the very information that Mr. Borda had given him back to Mr. Borda, for the purposes to which I have already alluded. When questioned whether he had ever taken any steps to investigate whether or not the information was true or untrue, the defendant replied: " I did not."

Again in the defendant's testimony he admits that he meant that the United States Government decided to put the officials of the United Wireless in jail for having committed a crime or crimes, and that this particular phase of the latter had been taken by the defendant from some of the New York newspapers.

There is much material in the cross-examination of the defendant which, in my opinion, lends force to the contention of

complainant's counsel that the defendant's writing shows mal-
ice.    I am of the opinion that the contents of People's Ex-
hibit No. 1, being the letter admittedly written and published
by the defendant of and concerning the complaining witness in
the case at bar is and constitutes a criminal libel as such crime
is defined in our consolidated laws.

The document upon which the crime is predicated taken in
its entirety, can lead to but one conclusion, that the defendant
intended to and did subject the complainant to hatred, con-
tempt and ridicule; and that the context of said letter tended
to injure complainant and to cause him to be shunned and
avoided in his business and occupation.

A review of the evidence makes it perfectly clear to my mind
that when the defendant wrote the above quoted portion of the
said letter he intended to convey to the minds of those who
read the communication that Mr. Espinosa was the " active
agent " of certain companies and company officials who have
been guilty of such an offense as to subject them to imprison-
ment, and that the Government had decided to put the princi-
pals of Mr. Espinosa, to wit: the said officials in fresh places
where neither the light of day nor the chill of the winter could
penetrate, meaning thereby that the said United States Gov-
ernment authorities had actually imprisoned the officials of
the company to which the defendant refers in his testimony.
The author of said letter by its terms couples the complaining
witness with the men and principals of the United Wireless
Company as criminals, and his form of language tends to char-
acterize Mr. Espinosa as their agent and advocate in their crim-
inal practices.    The charge that the complainant associates
with persons who indulge in criminal practices must by impli-
cation, if not in expressed words, hold him out as having knowl-
edge of the character of such associates.    The nature of the
society is referred to, and the relation of the parties disclosed.

The question of good faith, the truth of the statement, and

the existence of actual malice is for the jury. (Brooks v. Harrison, 91 N. Y. 89; Hamilton v. Eno, 81 N. Y. 116.)

The Court in the Hamilton case, supra, at page 122 says: "We do not perceive that the rule should differ in this respect, when one of the parties was a public officer, and the charge was made against him as such."

The defendant pleads qualified privilege as a defense. Privilege does not permit a person going beyond the limits of fair and honest criticism, and in such case the criticism must be subservient to the public interest and good, without evil or malice. Honest criticism of official conduct and of persons of a public character is subject to qualified privilege. It is too well known to need the citation of authorities "that to make a defense of privilege complete, good faith, an interest to be upheld, a statement properly limited in its scope, a proper occasion, and publication to proper persons, must all appear." (Walker v. Best, 107 App. Div. 304.) The Court is to judge whether the occasion was such that the communication was privileged; but, it seems, the jury is still to find whether the occasion has been abused or misused.

Chief Justice Folger, writing for the Court of Appeals, in the Hamilton case (supra) said:

"We are of the opinion that the official act of a public functionary may be freely criticized, and entire freedom of expression used in argument, sarcasm and ridicule upon the act itself; and that then the occasion will excuse everything but actual malice and evil purpose in the critic. We are of the opinion that the occasion will not of itself excuse an aspersive attack upon the character and motive of the officer; and that to be excused the critic must show the truth of what he has uttered of that kind."

The evidence adduced does not disclose that the complainant, Mr. Espinosa, was at the time of the attack upon him an attaché of or in any way connected with the Colombian Consu-

late that the defendant states he sought to have investigated. His mission was in no wise related to the Consulate; furthermore, his appointment did not have its origin there. It seems to me that the defendant exceeded his privilege in the communication in question when he, seeking to correct abuses which he claimed existed in a public office, attacked an individual foreign to the office and its powers, and made known the contents of the said letter, as defendant's counsel admits in his brief, by " showing the document to his Colombian friends " who, he adds, " had a perfect right to see it."

The letter People's Exhibit No. 1, is, in my opinion, defamatory and violates the statutes in such cases made and provided.

The People having sustained the burden of proof by presenting evidence of a prima facie character, I must hold the defendant upon proper papers, to await the action of the Grand Jury, and in default of five hundred dollars he will stand committed to the City Prison.